*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 07a0385p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

UNITED STATES OF AMERICA,

　　　　　　*Plaintiff-Appellee,*

　　　*v.*

ANTHONY H. ROSS,

　　　　　　*Defendant-Appellant.*

No. 05-4469

>

---

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 04-00611—Ann Aldrich, District Judge.

Argued: June 5, 2007

Decided and Filed: September 21, 2007

Before: MARTIN, BATCHELDER, and CLAY, Circuit Judges

---

## COUNSEL

**ARGUED:** Myron P. Watson, Cleveland, Ohio, for Appellant. Robert W. Kern, ASSISTANT UNITED STATES ATTORNEY, Cleveland, Ohio, for Appellee. **ON BRIEF:** Myron P. Watson, Cleveland, Ohio, for Appellant. Robert W. Kern, ASSISTANT UNITED STATES ATTORNEY, Cleveland, Ohio, for Appellee.

　　　　MARTIN, J., delivered the opinion of the court, in which CLAY, J., joined. BATCHELDER, J. (p. 9), delivered a separate opinion concurring in part and dissenting in part.

---

## OPINION

---

　　　　BOYCE F. MARTIN, JR., Circuit Judge. Defendant Anthony H. Ross appeals his conviction on two counts of bank fraud in violation of 18 U.S.C. §1344. Defendant challenges (1) the deliberate ignorance jury instruction given by the district court, (2) the government's questioning of defendant regarding his personal bankruptcy petition, (3) the sufficiency of the evidence supporting his conviction, and (4) the district court's finding that the intended loss from the bank fraud scheme totaled $634,300, resulting in a sentence enhancement. For the reasons that follow, we find the district court did not abuse its discretion in giving a deliberate ignorance instruction or in overruling Ross's objection to the government's cross-examination regarding his personal

1

bankruptcy petition, and that the evidence was sufficient to support both convictions for bank fraud. We find, however, that the district court's determination of intended loss at sentencing was in error. Accordingly, we AFFIRM defendant's conviction, VACATE his sentence, and REMAND for resentencing.

I.

## 1. The Nigerian Counterfeit Check Scam

Defendant Anthony Ross is a residential and commercial real estate broker in Lorain County, Ohio. Ross has been in real estate for approximately twenty years. After graduating from high school, Ross joined the Navy, where he became involved in real estate part time. After receiving an honorable discharge in 1993, Ross became a real estate agent in Lorain County. In 1997, after working as an agent for Realty One for several years, Ross obtained his broker's license and opened his own business, Northshore Realty. At the time of trial, Northshore Realty had eight full-time employees and seven affiliated independent agents. In 2001, Ross became a Certified Commercial Industrial Management (CCIM) specialist, a designation of some renown in real estate, which allowed him to conduct commercial real estate transactions. During his time as an agent in Lorain County, Ross was involved with the Lorain County Board of Realtors and in 2001 was elected its president.

When Ross opened Northshore Realty, he planned to develop and sell houses to low-income residents of Lorain County. Ross created E.A.R. Investors, Inc., which was a general contracting business affiliated with Northshore Realty for the express purpose of building low-income houses. Ross obtained financing through FirstMerit Bank and also from family and friends who invested between $15,000 and $20,000 in the project. Between 2001 and 2002, Ross sold 18 of these homes. Unfortunately, he was never able to return a profit on them, and suffered a financial loss. Throughout 2002, FirstMerit repeatedly reminded Ross to make timely payments on his credit line. In 2003, FirstMerit foreclosed on his credit line and Ross was unable to repay the loans he obtained from his family and friends. Also in 2003, Ross filed for personal bankruptcy, though his businesses remained intact.

It was during these financial difficulties that Ross met a potential commercial real estate investor. In 2001, Ross was attending a National Realtors' Association convention in Washington, D.C. where he met an individual by the name of Didi Duke. Duke and Ross agreed to develop commercial real estate in Lorain County. Duke offered to gather approximately $12.5 million in investment capital for the proposed project. Upon his return from the conference, Ross memorialized his agreement with Duke in a contract to represent Duke and a "group of investors in a development or an investment of about $12.5 million." Ross and Duke corresponded several times over the phone before agreeing to enter into this contract, and Ross had his attorney review the contract prior to signing it. Testimony at trial did not, however, provide any insight into the specifics of this alleged commercial real estate transaction other than $12.5 million was to be invested in commercial real estate projects in Lorain County, Ohio.

According to Ross's testimony, after the contract was signed, Duke mailed a $90,000 due diligence check to him. Ross received this check via overnight mail on October 25, 2002. The check was drawn on an Associates Credit Card Services Account with the Bank of New York. The check itself appears to be printed on a British Petroleum check. Upon receipt of this $90,000 check, Ross quickly went to a FirstMerit branch in Oakwood (nearest his office) to deposit it and to get $5,000 cash back. The branch informed him a hold would be placed on a check of that size and he would be unable to receive funds from the check until after the check cleared. Ross then decided to take the check to the FirstMerit branch in Sheffield (nearest his home) because "they [knew him] over there." At the Sheffield branch, Ross was able to gain approval from the manager to deposit

the check in his E.A.R. Investors account and to receive $5,000 back. Ross needed the $5,000 in order to make payroll at one of his low-income housing construction sites. A few days later, on October 28, 2002, Ross withdrew another $8,000 from the E.A.R. Investors account in order to have cash for a trip he was taking with his girlfriend (now wife) to New Orleans.

While in New Orleans, Ross's bank card and credit card from FirstMerit were frozen and he was unable to withdraw funds. Ross spoke with an official from the bank who informed him that the $90,000 check he had deposited was counterfeit. Upon his return from New Orleans, Ross contacted Duke to inquire about the counterfeit check. Duke informed Ross that his investors were no longer interested in investing in the United States after the events of 9/11 and had backed out of the transaction. Ross's accounts at FirstMerit remained frozen through the time of trial. Ross's financial difficulties subsequently proved too much to bear, and he filed for personal bankruptcy under Chapter 7 of the Bankruptcy Code on April 18, 2003. Ross was discharged from his bankruptcy on July 29, 2003.

During the summer of 2003, several months after the failed transaction with Duke, Ross was contacted by an individual named Didi Hassan. From May 2003 until sometime in the fall of that year, there were several email and telephonic communications between Ross and Hassan discussing the resurrection of the transaction originally arranged with Duke. Hassan led Ross to believe an individual by the name of Bello from Canada was arranging financing for the deal. Ross spoke with Bello on the phone and provided his personal information for purposes of securing financing.

In June 2003, Ross received via overnight mail a check for $346,990.60 drawn on the account of Gregory Dodge Hyundai Car Dealership in Highland Park, Illinois. Ross believed this check was from Mr. Bello and that Gregory Dodge Hyundai was an investor in the proposed real estate deal. Ross called Gregory Dodge Hyundai to confirm they were actually investors in the deal and discovered the check was counterfeit. Ross mailed the counterfeit check to Gregory Dodge Hyundai at their request.

A few days later, Ross received a Bank of America cashier's check for $5,000. Ross deposited this check in his FirstMerit account, believing it to be money sent from Hassan for the purposes of opening up an offshore account to facilitate the proposed deal. After depositing the check, Ross was contacted by the bank and informed the check was counterfeit. Because Ross had not withdrawn any funds from the check, the bank suffered no loss. Ross informed the bank he was dealing with Nigerians who were interested in investing in Lorain County. Ross shared several emails between himself and Hassan with the bank investigator. The bank investigator informed Ross that this was likely a scam and to stop dealing with Hassan or any other Nigerians. Ross promised to cut off his dealings with Hassan.

From August 2003 until May 2004 there was a break in the email communication between Ross and Hassan. No evidence was presented as to why this break occurred other than Ross's own testimony that he was ignoring Hassan because he was angry about the counterfeit checks.

In the summer of 2004, Hassan contacted Ross again in an attempt to revive the deal with new financing. Hoping to prevent any future counterfeit checks, Ross informed Hassan that he would only accept payment by wire transfer from a United States bank. Hassan agreed to a wire transfer and initiated negotiations with Ace Financial, allegedly based in Chicago, to secure financing in the amount of $700,000. In June of 2004, Ross emailed Hassan stating that he had been contacted by the Chicago financiers about the loan and that the disbursement would occur within seven to ten business days.

On July 15, 2004, National City Bank received an envelope containing a United States Treasury Check for $700,000 payable to A.H. Ross Corp. The account number for A.H. Ross Corp.

was typed on the endorsement line on the back of the check. Upon receipt of the check, National City immediately deposited the check in the A.H. Ross Corporation account. No hold was placed on the check as Treasury checks are considered guaranteed funds. At this time, Ross was out of town. When he returned to town on Monday, July 19, 2004, Ross was greeted with an email from Hassan asking if the funds had been credited to his account and a phone call and fax from Ace Financial in Chicago stating that the funds had been disbursed to his account at National City in the amount of $700,000. Ross testified that he believed the money to have been wired into his account.

Over the next three days, Ross purchased several cashier's checks from the bank in order to pay off debts owed to friends and family. He also moved $505,000 into an investment account at Edward Jones which he had opened approximately a month earlier. Within days, the Treasury check was returned to National City as counterfeit. Thanks to its own quick actions and the cooperation of Ross, National City was able to recover all but $60,824.

Upon learning that the funds were from a check rather than a wire, Ross immediately contacted Hassan and Ace Financial. At some point in the summer of 2004, the phone number for Ace Financial was cut off and Hassan stopped communicating with Ross. At this time, Ross had been in contact with the bank investigator and had attempted to negotiate a payment plan to pay back the money lost by the bank, but the bank turned down his request and referred the case for prosecution.

In November 2004, United States Secret Service agents showed up unannounced at Ross's office. One of the agents told Ross they were investigating a Nigerian counterfeit check scam of which Ross may have been a victim. Believing the agents were there to help him, Ross happily discussed all of his dealings with Duke and Hassan in detail. This meeting lasted several hours in a conference room in Ross's office. At some point during this meeting, Ross deduced that *he* was the actual suspect. The agents informed Ross of his *Miranda* rights and Ross subsequently agreed to offer a written statement. In his testimony and his written statement, Ross revealed that at some point after receiving the first counterfeit check, he researched Nigerian scams on the internet. After that research, Ross insisted that all transactions be done by wire transfer between United States banks and received assurances from Hassan that he and his associates were not part of any scam. Additionally, his written statement said that he was aware through his dealings with Duke and Hassan that they were likely attempting to scam him, but he wanted to "get them before they got me." He also stated that his "business dealing should have been cut off. Greed got the better of me." Finally, he said in his written statement that he had no idea who sent the $700,000 Treasury check.

On December 15, 2004, a federal grand jury in Cleveland, Ohio, returned an indictment charging Ross with two counts of Bank Fraud, in violation of 18 U.S.C. § 1344. The first count related to the $90,000 counterfeit check passed at FirstMerit, and the second count related to the $700,000 check deposited at National City. On July 18, 2005, a jury found Ross guilty of both counts of bank fraud. On October 20, 2005, Ross was sentenced to 37 months incarceration, followed by four years of supervised release.

### 2. District Court's Determination of Intended Loss At Sentencing

At Ross's sentencing hearing, the district court adopted the findings of the probation officer that the actual loss resulting from Ross's bank fraud was $71,648.86 and that the intended loss was $634,300.00.

In computing his sentence, the district court determined that the Sentencing Guideline for violation of 18 U.S.C. § 1344 calls for a Base Offense Level of 7. The district court also found that pursuant to U.S.S.G. § 2B1.1(b)(1)(H) the offense level should be increased by 14 because the loss

was between $400,000 and $1,000,000.  The district court stated it was constrained by the definition of "loss" contained in Application Note 3 to U.S.S.G. § 2B1.1(b)(1), which states that "loss is the greater of actual loss or intended loss."  Ross objected to the intended loss amount of $634,300 but the district court overruled his objection stating only that a jury found Ross guilty on both counts of bank fraud for passing two counterfeit checks totaling $790,000.

The district court found that Ross had a Total Offense Level of 21; because Ross had no prior convictions, he was placed in Criminal History Category I.  The guidelines range for that Offense Level and Criminal History Category is 37 to 46 months.  The district court sentenced Ross to 37 months imprisonment and four years of supervised release.  The district court noted this was at the low end of the guidelines range.

II.

**1. Deliberate Ignorance Instruction**

This Court reviews a district court's choice of jury instructions for abuse of discretion. *United States v. Prince*, 214 F.3d 740, 761 (6th Cir. 2000).  A trial court has broad discretion in crafting jury instructions and does not abuse its discretion unless the jury charge "fails accurately to reflect the law." *United States v. Layne*, 192 F.3d 556, 574 (6th Cir. 1999) (quoting *United States v. Busacca*, 863 F.2d 433, 435 (6th Cir. 1988)).  Moreover, no single provision of the jury charge may be viewed in isolation; rather, the charge must be considered as a whole. *United States v. Lee*, 991 F.2d 343, 350 (6th Cir. 1993).  A judgment may be reversed based upon an improper jury instruction "'only if the instructions, viewed as a whole, were confusing, misleading, or prejudicial.'" *United States v. Harrod*, 168 F.3d 887, 892 (6th Cir. 1999) (quoting *Beard v. Norwegian Caribbean Lines*, 900 F.2d 71, 72-73 (6th Cir. 1990)).

The district court gave the following deliberate ignorance instruction:

> Next I want to explain something about proving a defendant's knowledge. No one can avoid responsibility for a crime by deliberately ignoring the obvious.  If you are convinced that Anthony Ross deliberately ignored a high probability that any checks or deposits received from Didi Hassan or any of his associates would be counterfeit or otherwise fraudulent in nature, then you may find that Anthony Ross knew that the $700,000 deposit into his National City Bank account on July 15, 2004 was also fraudulent in nature.

> But to find this, you must be convinced beyond a reasonable doubt that Anthony Ross was aware of a high probability that any checks or deposits received from Didi Hassan or any of his associates would be counterfeit or fraudulent in nature, and that Anthony Ross deliberately closed his eyes to what was obvious. Carelessness or negligence or foolishness on his part is not the same as knowledge, and is not enough to convict.  This, of course, is all for you to decide.

This instruction tracks verbatim with the Sixth Circuit Pattern Instruction 2.09 on deliberate ignorance.  It appears the district court only instructed on deliberate ignorance with regard to the second count of bank fraud, i.e. the count relating to the $700,000 Treasury check.

Ross argues that the district court abused its discretion because there was insufficient evidence to support a deliberate ignorance instruction.  Ross's argument is largely controlled by *United States v. Mari*, 47 F.3d 782 (6th Cir. 1995).  In *Mari*, this Court held that when a district court gives a deliberate ignorance instruction that does not misstate the law but is unsupported by sufficient evidence, it is at most harmless error, so long as there is sufficient evidence of the defendant's actual knowledge to support a conviction. *Id*.  The *Mari* Court, relying on the Supreme

Court's decision in *Griffin v. United States*, 502 U.S. 46 (1991), reasoned that if a jury instruction does not misstate the law, but rather is unsupported by the evidence, the jury's conviction will not be overturned if there is evidence supporting a conviction on another instructed theory. *Id.* at 786. In subsequent cases this Circuit has reaffirmed *Mari*'s reasoning. *See, e.g.*, *United States v. Monus*, 128 F.3d 376, 390-91 (6th Cir. 1997) ("[E]ven if there had been insufficient evidence to support a deliberate ignorance instruction, we must assume that the jury followed the jury charge and did not convict on the grounds of deliberate ignorance.").

Here, Ross does not argue that the instruction given misstated the law on deliberate ignorance.[1] And, as the government points out, there is sufficient evidence to support a deliberate ignorance instruction on the second count – the only count for which the instruction was given. Over the course of two years, Ross received four counterfeit checks, one of which he found so suspicious that he called the account holder to determine its validity, only to confirm his suspicion that it was a fraud. After the $90,000 check was returned as counterfeit, Ross went so far as to conduct research on Nigerian scams and testified that he believed his deal to be a scam. He even promised National City Bank he would cease all dealings with the Nigerians. This pattern of conduct shows Ross was aware that he might be the target of a scam and that counterfeit checks were part of that scam, yet he continued to accept fraudulent checks. This evidentiary record supports a deliberate ignorance instruction on the second count.

### 2. Ross's Testimony Regarding His Personal Bankruptcy Petition

During direct examination, Ross testified that he filed a petition for personal bankruptcy under Chapter 7 of the Bankruptcy Code. He testified that "all the loans and people that [he] owed were put into the bankruptcy. . . ." On cross examination, it was elicited that Ross listed some creditors related to his failed modular housing plan but failed to list others. Ross's redirect testimony explained that these alleged discrepancies were due to the fact that his bankruptcy was personal, and some of his investors had contracts with his businesses and not with him personally.

At trial, Ross's counsel timely objected to the prosecution's cross-examination questions regarding inconsistencies in Ross's bankruptcy petition as improper Rule 404(b) evidence of other crimes, wrongs or acts. Ross's attorney argued that the government was attempting to improperly elicit evidence of bankruptcy fraud. The district court overruled the objection and allowed the line of questioning. Ross now renews this claim on appeal.

"[A] trial judge's evidentiary decisions will not normally be reversed absent a clear showing of abuse of discretion." *United States v. Daniels*, 948 F.2d 1033, 1035 (6th Cir. 1991) (citing *United States v. Hickey*, 917 F.2d 901, 904 (6th Cir. 1990)).

Ross's argument falls flat. During his direct examination he testified that he listed all of his personal creditors, including friends and family, opening the door for exploration of that statement on cross-examination. Accordingly, the government attempted to elicit on cross-examination that Ross had improperly excluded some personal creditors from his bankruptcy while including others. The government is allowed to impeach any statement made by Ross in his direct examination through cross-examination under Federal Rule of Evidence 607 ("The credibility of a witness may be attacked by any party. . . ."). This was exactly what occurred at trial. The government's questions were intended to impeach Ross's earlier testimony that he had listed all of his creditors and thus were proper under Rule 607. *See Virostek v.Liberty Twp. Police Dep't/Trs.*, 14 F. App'x

---

[1] Even if Ross had so argued, the district court strictly adhered to the wording of the Sixth Circuit Pattern Jury Instruction 2.09, which this Court has held accurately states the law of deliberate ignorance. *See e.g.*, *United States v. Beaty*, 245 F.3d 617, 622 (6th Cir. 2001).

493, 506-07 (6th Cir. 2001).  Accordingly, we hold that the district court did not abuse its discretion in overruling Ross's objection.

### 3.  Sufficiency of the Evidence

Ross argues on appeal that the evidence was insufficient to support his convictions for bank fraud.  When considering such an argument this Court does not "weigh the evidence presented, consider the credibility of witnesses, or substitute [its] judgment for that of the jury." *United States v. M/G Trans. Servs., Inc.*, 173 F.3d 584, 588-89 (6th Cir. 1999). Our task is to determine "whether, after viewing the evidence in the light most favorable to the prosecution, *and after giving the government the benefit of all inferences that could reasonably be drawn from the testimony*, any rational trier of fact could find the elements of the crime beyond a reasonable doubt." *Id.* at 589 (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)) (emphasis in original).  Thus, Ross "bears a very heavy burden" in his sufficiency of the evidence challenge.  *United States v. Davis*, 397 F.3d 340, 344 (6th Cir. 2005) (internal citations omitted).

In order to prove a violation of 18 U.S.C. § 1344, the government must prove three elements: "(1) that the defendant knowingly executed or attempt to execute a scheme to defraud a financial institution; (2) that the defendant did so with the intent to defraud; and (3) that the financial institution was insured by the Federal Deposit Insurance Corporation." *Davis*, 397 F.3d at 344.  At issue is whether the government adequately proved beyond a reasonable doubt that Ross had the requisite knowledge required to be convicted of bank fraud under 18 U.S.C. § 1344.  In other words, Ross must have "knowingly" participated in a scheme to defraud FirstMerit and National City Bank.

Ross argues that there is no evidence he knew the $90,000 check was counterfeit.  He also argues that he believed the $700,000 deposited to his account was via wire transfer and not by check, and thus he had no knowledge a check was even used, let alone a counterfeit check.

As is often the case, direct evidence of knowledge and intent is hard to come by, and thus must be proven by circumstantial evidence.  This Circuit has stated that "circumstantial evidence alone is sufficient to sustain a conviction, and such evidence need not remove every reasonable hypothesis except that of guilt." *United States v. Winkle*, 477 F.3d 407, 413 (6th Cir. 2007) (internal quotation marks and citations omitted).

In the present case, the government offered evidence that over the course of two years Ross passed a counterfeit $90,000 check, received a suspicious and counterfeit $346,000 check in the mail, and deposited a counterfeit $5,000 check.  Additionally, during that same period a counterfeit $700,000 Treasury check was mailed to his bank with instructions to be deposited in his account. The jury also considered more than forty emails between Ross and the "Nigerians" and listened to Ross's own testimony from the witness stand.

Ross presented evidence that he was in contact with investors from overseas and that he believed those investors were legitimate.  He also presented evidence that after he received the first three counterfeit checks he became very upset with the overseas investors and required all future transactions be done by wire transfer between United States banks.  The evidence also appears to show that he believed the $700,000 that was deposited in his account was a wire transfer and not a Treasury check.  Additionally, Ross did not run and hide from the alleged fraud.  Instead, Ross attempted to work out a payback program with the bank.

While this case presents a close evidentiary call, we do not believe Ross has met his very heavy burden of showing the evidence was insufficient.  The jury chose not to believe Ross's testimony and found that there was enough circumstantial evidence to prove Ross knowingly intended to defraud a bank.  The government offered evidence of Ross's motive to commit bank fraud.  Ross was in dire financial straits.  Ross had filed for personal bankruptcy.  Ross needed

money to pay his debts and keep his businesses afloat. The government also called into question Ross's meeting with Duke. The Secret Service Agent could find no evidence of a Didi Duke attending the Realtors' conference in Washington, D.C. Ross also admitted to researching Nigerian scams on the internet and that he believed this proposed deal was likely a scam. He even stated that his greed had got the better of him. And ultimately, Ross did receive four counterfeit checks and deposited three of them. This circumstantial evidence calls into doubt Ross's story that he was simply the victim of an elaborate Nigerian counterfeit check scam. Thus it cannot be said that *no* rational trier of fact could have found beyond a reasonable doubt that Ross knowingly participated in bank fraud.

### 4. The District Court's Loss Determination at Sentencing

At sentencing, Ross objected to the probation office's presentence report finding that the intended loss from the two counts of bank fraud totaled $634,300. Ross argued the intended loss was zero and that the government failed to prove he intended any loss. The district court rejected Ross's argument and adopted the presentence report's finding that the intended loss was $634,300.

The district court gave the following statement on the record in support of its rejection of Ross's objection to the intended loss amount:

> It seems that the jury heard the evidence, and the jury made up their mind as to what is credible. That's why we have a guilty verdict on both counts. So at this point I think that the total offense level of 21 is an accurate calculation furnished by the probation office . . . .

This Court has held that "Federal Rule of Criminal Procedure 32(i)(3)(B) requires the district court at sentencing to rule on any disputed portion of the presentence report or other controverted matter." *United States v. White*, Nos. 05-3403/3442; 06-3239/3240, 2007 WL 1662021, at *27 (6th Cir. June 11, 2007) (internal quotation marks omitted). Thus, if the defendant raises a dispute to the presentence report, the "court may not merely summarily adopt the factual findings in the presentence report or simply declare that the facts are supported by a preponderance of the evidence." *United States v. Solorio*, 337 F.3d 580, 598 (6th Cir. 2003) (internal citations omitted). "Rather, the district court must affirmatively rule on a controverted matter where it could potentially impact the defendant's sentence;" that is, "the district court must *actually find facts*, and it must do so by a preponderance of the evidence. *White*, 2007 WL 1662021, at *27, 28. We require this literal compliance with Rule 32(i)(3)(B) because it "enhanc[es] the accuracy of the sentence and the clarity of the record." *United States v. Treadway*, 328 F.3d 878, 886 (6th Cir. 2003).

Here, the district court failed to make any factual findings on the record in support of its intended loss calculation. Rather, the district court simply embraced the figures set forth in the presentence report over Ross's objections. "[R]eliance on the [presentence report] is insufficient when the facts are in dispute." *Treadway*, 328 F.3d at 886. Accordingly, we find the district court erred in failing to explain its determination with actual factual findings supported by a preponderance of the evidence that the intended loss amounted to $634,300.

III.

For the foregoing reasons, we AFFIRM the district court's decision to give a deliberate ignorance instruction, AFFIRM the district court's decision to overrule Ross's 404(b) objection, AFFIRM the jury's conviction on both counts of bank fraud, but VACATE Ross's sentence and REMAND for resentencing.

---

**CONCURRING IN PART, DISSENTING IN PART**

---

ALICE M. BATCHELDER, Circuit Judge, concurring in part and dissenting in part.  I concur in full with the majority's decision to affirm Ross's conviction, but I disagree that the district court violated its duty under Fed. R. Crim. P. 32(i)(3)(B) and, for this reason, dissent from the court's decision to vacate Ross's sentence and remand for resentencing.

Fed. R. Crim. P. 32(i)(3)(B) requires a district court to "rule" on "any disputed portion of the presentence report or other controverted matter."  At sentencing, Ross argued that the intended loss should have been zero because he "never *intended* a loss with regard to the bank."  When presented with this credibility-based (rather than a fact-based) argument, the court reasonably adopted the jury's assessment of Ross's credibility.  In doing so, the district court responded to the only issue raised by Ross and thus satisfied its duty to "rule" on this "controverted matter."

This is not a case where the district court "summarily adopt[ed] the factual findings in the presentence report or simply declare[d] that the facts [were] supported by a preponderance of the evidence."  *See United States v. Solorio*, 337 F.3d 580, 598 (6th Cir. 2003).  Ross did not contest or ask the court to recalculate the loss figure in the presentence report, but merely argued that he did not intend a loss to the bank.  Under these circumstances, the court was under no duty to make an independent loss calculation.  The issue before the district court was clear:  If Ross intended a loss (i.e., if he sought to defraud the banks), then the loss calculation in the presentence report was correct.  If, however, he did not intend a loss (i.e., if he did not seek to defraud the banks), then the loss calculation would be zero.  Perhaps, the district court found this argument to be baffling in light of the fact that Ross had been found guilty of bank fraud, one of the elements of which — as the majority opinion correctly explains with regard to Ross's claim of insufficient evidence — is the "intent to defraud."  *See also United States v. Everett*, 270 F.3d 986, 989 (6th Cir. 2001).  The court nevertheless addressed Ross's argument, adopted the jury's adverse credibility finding, and sentenced Ross as prescribed in the guidelines.  Under these circumstances, that is all Fed. R. Crim. P. 32(i)(3)(B) required.