RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 26a0040p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────

EATON CORPORATION,

*Plaintiff-Appellee,*

*v.*

ANGSTROM AUTOMOTIVE GROUP, LLC,

*Defendant-Appellant.*

No. 24-3604

─────────────

Appeal from the United States District Court for the Northern District of Ohio at Cleveland.
No. 1:20-cv-00893—Bridget Meehan Brennan, District Judge.

Argued:  December 11, 2025

Decided and Filed:  February 13, 2026

Before:  SUTTON, Chief Judge; BOGGS and BLOOMEKATZ, Circuit Judges.

─────────────

## COUNSEL

**ARGUED:**  Seth D. Gould, THE MILLER LAW FIRM, P.C., Rochester, Michigan, for Appellant.  Emily K. Anglewicz, ROETZEL & ANDRESS, LP, Akron, Ohio, for Appellee. **ON BRIEF:**  Seth D. Gould, Marc L. Newman, Jacob M. Campbell, THE MILLER LAW FIRM, P.C., Rochester, Michigan, for Appellant.  Emily K. Anglewicz, ROETZEL & ANDRESS, LP, Akron, Ohio, for Appellee.

─────────────

## OPINION

─────────────

BLOOMEKATZ, Circuit Judge.  This case stems from a commercial dispute between Eaton Corporation, a global manufacturer of automotive clutches, and Angstrom Automotive Group, LLC, a components manufacturer that supplied levers for Eaton's clutches.  After some of Angstrom's levers caused Eaton's clutches to fail, Eaton sued Angstrom and Angstrom's

subsidiary, Wrena, LLC,[1] for breach of contract and breach of express and implied warranties. Angstrom's primary argument throughout the case was that an Ohio statute requiring pre-suit notice of breach barred Eaton from recovery. The case went to trial, and a jury returned a verdict in favor of Eaton. We affirm.

## BACKGROUND

### I.     Factual History

Eaton and Angstrom executed a production contract that required Angstrom, through its subsidiary Wrena, to manufacture levers for use in Eaton's clutches. Under the agreement, Angstrom had no design responsibility. It manufactured the levers "to print," that is, according to Eaton's specifications. The contract contained provisions establishing quality standards for the levers, in addition to procedures for resolving any disputes. Relevant here, Section 6.4 of the contract required Eaton to issue a Defective Material Report to Angstrom if the levers failed to conform to the established quality standards. Section 9.1 further provided that notices "required or permitted" under the contract must be communicated in writing to be deemed effective. Supply Contract, R. 1-1, PageID 27.

Between April 2017 and June 2018, levers broke inside Eaton's clutches, causing significant numbers of them to fail. This period is referred to by the parties as the "warranty spill." As early as May 2017, Eaton's internal testing indicated problems with some of the levers. And by October 2017, Eaton had received a complaint from a trucking company that at least one of its clutches failed while the truck was in use. Though the October 2017 complaint initially appeared to be an isolated incident, Eaton received additional reports of clutch failures in early 2018.

Eaton first communicated to Angstrom in February 2018 that it had received non-conforming levers. On February 2, Eaton emailed Angstrom that it had been "receiving feedback of failures in the field." Feb. 2, 2018 Email, R. 81-13, PageID 1916. The following week, Eaton issued a formal Defective Material Report, explaining that the levers did not meet

---

[1]Wrena filed for bankruptcy while this appeal was pending and subsequently voluntarily dismissed its appeal. We use "Angstrom" in this opinion to refer to Angstrom and Wrena, collectively.

their print specifications. After lab tests indicated that the levers were conforming, Eaton withdrew its initial report. But in May 2018, after discovering that its original lab tests had been affected by human error, Eaton issued a second report confirming the defects.

The parties dispute what unfolded after these initial communications. According to Angstrom, Eaton communicated on several occasions that it did not consider Angstrom liable for the broken levers. Eaton, on the other hand, maintains that it repeatedly made clear that manufacturing defects in the levers had caused the clutches to fail. In July 2019, the parties met in person. Eaton and Angstrom agree that at that meeting they discussed whether the failed levers implicated the parties' agreement about their manufacturing standards. But Angstrom contends that this July 2019 meeting was the first time it received notice that there might be an unresolved dispute about potential liability.

## II.    Procedural History

Approximately nine months later, in April 2020, Eaton sued Angstrom for breach of contract and breach of express and implied warranties. Angstrom moved for judgment on the pleadings and summary judgment, arguing in relevant part that the suit was barred by an Ohio statute requiring pre-suit notice of breach. *See* Ohio Rev. Code § 1302.65(C)(1). The district court denied Angstrom's combined motion, reasoning that there were sufficient allegations in the complaint and genuine disputes of material fact regarding whether Eaton provided adequate notice of breach.

The case went to trial in June 2024. Unsurprisingly, the parties' theories of responsibility differed. According to Angstrom, the clutch failures were caused by Eaton's own defective lever design, as well as Eaton's decision to use these levers (as opposed to a stronger model) in its heavy-duty clutches. Eaton argued, on the other hand, that the defective levers were the result of Angstrom's failure to properly maintain its manufacturing equipment. The jury returned a verdict in favor of Eaton on all claims, awarding Eaton $30 million in damages.

Angstrom timely filed this appeal.

## ANALYSIS

On appeal, Angstrom challenges the district court's interpretation of the Ohio statute requiring pre-suit notice of breach. Additionally, Angstrom argues that two of Eaton's witnesses offered improper testimony at trial that affected the jury's ability to return a fair verdict. Each of Angstrom's challenges fail.

## I.      Ohio Revised Code § 1302.65(C)(1)

This appeal primarily hinges on the proper interpretation of Ohio Revised Code § 1302.65(C)(1), Ohio's statute requiring pre-suit notice of breach. The statute requires a buyer that has accepted the delivery of goods to notify the seller of a breach involving those goods within a reasonable time. If the buyer fails to do so, it will be barred from recovering for a breach. The statute does not define what constitutes notice.

Angstrom interprets Ohio's statute to require the buyer to give explicit notice to the seller that it believes there has been a breach. On this view, Angstrom contends that Eaton's suit is barred because Eaton did not communicate in a reasonably timely manner that it considered Angstrom responsible for breaches of contract and warranties.[2] Thus, Angstrom argues that the district court erred in denying its combined motion for judgment on the pleadings and summary judgment, and in instructing the jury on Ohio's notice requirement. With respect to each of Angstrom's challenges across these various procedural contexts, its argument is essentially the same: the Ohio statute mandates more explicit notice of breach than the district court required. We therefore first analyze the relevant statutory provision—Ohio Revised Code § 1302.65(C)(1)—before turning to each of Angstrom's challenges.

### A.      *Chemtrol* Standard

Ohio law does not support Angstrom's strict view of what type of notice satisfies the statute. The seminal case on the issue is *Chemtrol Adhesives, Inc. v. American Manufacturers Mutual Insurance Co.*, 537 N.E.2d 624 (Ohio 1989). In *Chemtrol*, the Ohio Supreme Court

---

[2]As both parties agree, and Ohio courts have held, the reference to "breach" in the statute extends to both contract and warranty claims. *See, e.g.*, *Jones v. Davenport*, 2001 WL 62513, at *8 (Ohio Ct. App. Jan. 26, 2001) (citing *AGF, Inc. v. Great Lakes Heat Treating Co.*, 555 N.E.2d 634, 636–67 (Ohio 1990)).

endorsed a less demanding interpretation of the statute, clarifying that notice may be adequate even without a "specific[] alleg[ation]" of breach. *Id.* at 638. The court further explained that notices can vary in form: in some circumstances, oral notice may be sufficient; and in others, where there is sufficient evidence that the seller had "knowledge" of the issue with the transaction, notice may sometimes be "inferred." *Id.*

The Ohio Supreme Court's interpretation was based, in part, on the commentary accompanying § 1302.65(C)(1). As *Chemtrol* acknowledges, the Official Comment provides "somewhat contradictory guidance as to how the notice requirement is to be construed." *Id.* at 636. For example, the Comment explains that the notice's content "need merely be sufficient" to make the seller aware "that the transaction is still troublesome and must be watched." Ohio Rev. Code § 1302.65(C)(1), cmt. 4. Additionally, the notice need not provide "a clear statement of all the objections that will be relied on," nor must it take the form of "a claim for damages or of any threatened litigation or other resort to a remedy." *Id.* Yet, the Comment also says the notice must be sufficient to "inform[] the seller that the transaction is claimed to involve a breach." *Id.*

In *Chemtrol*, the Ohio Supreme Court adopted a reading of the provision that places greater emphasis on what it described as the Comment's "more lenient clauses." *Chemtrol*, 537 N.E.2d at 636. Subsequently, in *AGF, Inc. v. Great Lakes Heat Treating Co.*, the court reaffirmed its permissive approach, explaining that "no specific form or words are required in the notice of breach" to satisfy the statute's requirements. 555 N.E.2d 634, 637 (Ohio 1990). Thus, as applied to the facts of this case, Eaton merely needed to inform Angstrom in a timely manner that the transaction was "troublesome" or there was a problem with the levers' quality.

Angstrom argues for an interpretation of the notice requirement from an older, since-repudiated line of Sixth Circuit cases. In *Standard Alliance Industries, Inc. v. Black Clawson Co.*, we interpreted the Uniform Commercial Code's analogous provision as mandating clear notice that the buyer considered the seller in breach. 587 F.2d 813, 825 (6th Cir. 1978); *see also Roth Steel Prods. v. Sharon Steel Corp.*, 705 F.2d 134, 152–53 (6th Cir. 1983); *K&M Joint Venture v. Smith Int'l Inc.*, 669 F.2d 1106, 1113–16 (6th Cir. 1982). But in *Chemtrol*, the Ohio Supreme Court explicitly "reject[ed] the strict reading" endorsed by *Standard Alliance*,

explaining that notice may be sufficient even without a specific allegation of breach. 537 N.E.2d at 638.

Given the Ohio Supreme Court's clear guidance, we also reject Angstrom's reliance on our interpretation of similar notice requirements from other states. Angstrom points to our recent holding in *Bunn v. Navistar* for support of its position that "complaints of mere defects" are insufficient to meet the notice requirement. Appellant's Br. at 40 (citing *Bunn v. Navistar, Inc.*, 797 F. App'x 247, 254 (6th Cir. 2020)). But in *Bunn* we adopted the "traditional" or strict view when interpreting Tennessee's notice statute, thus requiring plaintiffs to be clear "that the defendant will be asked to meet a claim for damages." *Bunn*, 797 F. App'x at 254. And in reaching that holding, we explicitly distinguished Ohio. We acknowledged that *Chemtrol* rejected a strict reading of the Ohio notice provision "in favor of the more relaxed view." *Id. Bunn*, therefore, does not help Angstrom and instead supports Eaton in confirming that *Chemtrol*'s more lenient approach governs in Ohio.

Accordingly, as we turn to analyzing Angstrom's various claims about the notice statute, we apply the Ohio Supreme Court's interpretation from *Chemtrol*.

### B.      Motion for Judgment on the Pleadings

Angstrom first contends that it was entitled to judgment on the pleadings under Federal Rule of Civil Procedure 12(c) because Eaton failed to sufficiently allege notice of breach in its complaint, as required by Ohio Revised Code § 1302.65(C)(1). Reviewing de novo, we conclude that the district court properly denied the motion. *Ziegler v. IBP Hog Mkt., Inc.*, 249 F.3d 509, 511–12 (6th Cir. 2001).

Eaton's complaint contained sufficient allegations of notice to overcome a challenge at the pleadings stage. Eaton alleged that throughout the period when it was investigating the defective levers, it "regularly communicated its findings to [Angstrom] verbally, in writing and in person." Compl., R. 1, PageID 12. Specifically, Eaton alleged that it issued a Defective Material Report in February 2018 and, following additional testing, reissued another report in May 2018; both reports explained that the levers did not conform to Eaton's print specifications.

*Id.* at PageID 10.  Eaton also alleged that it attempted to meet with Angstrom at various points to discuss the issue with the levers.

Despite these allegations, Angstrom argues that Eaton's complaint does not allege that it provided adequate pre-suit notice under § 1302.65(C)(1) because Eaton never explicitly claimed that Angstrom was in breach prior to filing suit.  But, as we have explained, no magic words are required as a matter of Ohio law.  Taking the pleadings as true, as we must for Rule 12(c) motions, Eaton plausibly established that it provided Angstrom with notice that there was an ongoing issue with the transaction.  *See Solo v. United Parcel Serv. Co.*, 819 F.3d 788, 793 (6th Cir. 2016) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  And that is all that is required under *Chemtrol*, so Angstrom was not entitled to judgment on the pleadings.

C.          **Motion for Summary Judgment**

Angstrom's challenge to the denial of its summary-judgment motion is essentially the same as its challenge to the denial of its motion for judgment on the pleadings—except that it is based on the evidentiary record as opposed to the pleadings.  Again, the district court properly concluded that Angstrom was not entitled to summary judgment.  *See* Fed. R. Civ. P. 56(a). We review a district court's denial of summary judgment de novo.  *Shahid v. Ford Motor Co.*, 76 F.3d 1404, 1408 (6th Cir. 1996).  At summary judgment, we construe the evidence and draw all reasonable inferences in favor of the non-moving party—which is Eaton, here.  *Doe v. Univ. of Ky.*, 111 F.4th 705, 715 (6th Cir. 2024).  Then we ask whether, based on the record evidence, a genuine dispute of material fact exists such that a jury could find for Eaton, meaning the case cannot be resolved as a matter of law.  *See id.*; *Jackson v. VHS Detroit Receiving Hosp., Inc.*, 814 F.3d 769, 775 (6th Cir. 2016).

The record evidence at summary judgment demonstrates genuine disputes of material fact as to whether Eaton sufficiently communicated notice of breach, as required by Ohio's statute. *See* Ohio Rev. Code § 1302.65(C)(1).  In Eaton's recounting of the parties' interactions, beginning in February 2018, it repeatedly communicated that there was a manufacturing problem with the levers.  Eaton pointed to an email from February 2018, in which Eaton stated that it was "receiving feedback of failures in the field."  Feb. 2, 2018 Email, R. 81-13, PageID 1916.

The email also explained that Eaton "wanted to inform [Angstrom] of what [was] transpiring so that [it] ha[d] time to determine the root cause." *Id.*

Eaton also pointed to its Defective Material Reports from February and May 2018, as well as the months-long period during which the parties communicated about the ongoing problems with the levers. In April 2018, for example, Eaton emailed to follow up about additional complaints of failed levers, explaining that "[i]t seem[ed]" that the parties were "still not in the clear concerning the[] components." Email Communications, R. 81-15, PageID 1931. The email also requested Angstrom's "capability data" for the levers, "[t]o support on-going troubleshooting efforts." *Id.*

Additionally, Eaton submitted record evidence that contemporaneously memorialized the parties' verbal interactions during this period. At a September 2018 meeting, Eaton stated that the parties discussed the issues with the levers, and whether they were properly manufactured according to the design specifications—but that Angstrom objected to that being the root cause. Eaton also suggested that, at the meeting, there was clearly a conflict between the parties' positions, but that both sides agreed that further discussion was warranted. Later, at a March 2019 meeting where the parties renegotiated their supply contract, Eaton states that it again brought up the outstanding warranty dispute.

Angstrom contests this account. It maintains that Eaton should have provided notice of the manufacturing defects in May 2017, when Eaton received its first internal test results, or at the latest in October 2017, when the trucking company notified Eaton of a clutch failure in the field. Contrary to Eaton's evidence, Angstrom asserts that Eaton never provided notice of these results. Rather, Angstrom contends, it was not until the July 2019 meeting that Eaton raised the potential warranty dispute. And, pointing to a series of communications between the end of 2018 and early 2019, Angstrom argues that the general thrust of Eaton's communications suggested that Angstrom was relieved from all liability. For example, Angstrom explains that Eaton issued a design deviation for the levers that indicated Angstrom was not liable for warranty costs, assured Angstrom that it was not responsible for any recall, and even renegotiated the parties' supply contract without mentioning the potential legal claims.

In Angstrom's view, this pattern of communication provides additional evidence of Eaton's deceptive intent and unreasonable delay in communicating the potential breach.

Again, Angstrom's theory on appeal relies on its much-too-strict conception of the pre-suit notification requirement—that despite all the evidence, Eaton "never informed" Angstrom of the breach because it never expressly communicated its intent to pursue legal claims. Appellant's Br. at 34. Setting the interpretive dispute aside, Angstrom's argument boils down to a quarrel over the evidence, which is why the Ohio Supreme Court indicated that notice is a question courts should be "reluctant" to grant summary judgment on. *See Chemtrol*, 537 N.E.2d at 636. Eaton reads the communications to convey that the levers fail the quality standards agreed to in the contract, while Angstrom interprets the communications as absolving it of fault. This evidentiary dispute precludes summary judgment, so the district court properly denied Angstrom's motion.

### D. Jury Instruction

Finally, Angstrom challenges the jury instruction on notice of breach, again largely pushing its faulty interpretation of Ohio Revised Code § 1302.65(C)(1), but also arguing that the instruction was not tailored to the facts or consistent with the parties' contract. We review a district court's jury instruction for abuse of discretion. *United States v. Taylor*, 800 F.3d 701, 709 (6th Cir. 2015). A district court has not abused its discretion unless the instruction failed to "accurately [] reflect the law" or "if the instructions, viewed as a whole, were confusing, misleading, or prejudicial." *United States v. Ross*, 502 F.3d 521, 527 (6th Cir. 2007) (citation modified). The district court did not abuse its discretion.

*First*, the district court's notice instruction accurately stated the law. In instructing the jury, the district court explained that the jurors could find the notice sufficient if it "alert[ed] the seller that there [was] a problem with the goods." Trial Tr., R. 173, PageID 6101–02. In full, the jury instruction provided:

> A buyer who has accepted goods must notify the seller of any claimed breach by the seller or be barred by [sic] recovery. The notice may be written or oral. The notice is sufficient if it alerts the seller that there is a problem with the goods. It need not state all that is wrong with the goods. The notice must be given by the

buyer within a reasonable time after the buyer discovered or should have discovered the breach.  If the buyer did not give such notice, the buyer is barred from any remedy against the seller even if the seller was not harmed by the failure to give proper notice.

This instruction, modeled after Ohio's pattern jury instruction, is consistent with *Chemtrol*.

*Second*, the jury instruction need not have been tailored with greater specificity to the facts of the case.  Angstrom argues that because the facts of this case are not similar to the facts of *Chemtrol*, a jury instruction derived from *Chemtrol* is not applicable.  However, the standard derived from *Chemtrol* is a legal one, and because the legal question of whether adequate and timely notice was provided is implicated in this case, the district court appropriately instructed the jury on that legal standard.  Although the standard's application to different sets of facts may yield different answers than in *Chemtrol*, that has no bearing on whether the jury instruction properly articulated the relevant legal standard.

*Third*, the jury instruction is not clearly inconsistent with the parties' contract.  Section 9.1 of the parties' contract states that "[a]ll notices or other communications which are required or permitted under [the] Agreement shall be in writing."  Supply Contract, R. 1-1, PageID 27.  Because the jury instruction says the notice need not be in writing, Angstrom says it was erroneous.  Even assuming that Angstrom's objection on this basis was not forfeited, Angstrom's challenge still fails.  To be sure, Ohio law recognizes that the "effect of the provisions of [its] Chapters," including § 1302, "may be varied by agreement."  Ohio Rev. Code § 1301.02(C).  But Section 9.1 does not clearly displace the statutory provision on its face.  Rather, Section 9.1 seems to require that the notices and communications that arise *under* the contract (such as the Defective Material Reports) must be in writing to be deemed valid.  And the contract contains no specific provision relating to notice of breach.  Therefore, the district court did not abuse its discretion by declining to read the parties' contract as displacing the default requirements of § 1302.65(C)(1), and in instructing the jury consistent with *Chemtrol*.

## II.    Witness Testimony

Angstrom also seeks reversal of the final judgment, and a new trial, on the grounds that two of Eaton's witnesses offered improper testimony that affected the jury's ability to return a

fair verdict. *First*, Angstrom argues that Eaton's expert witness, Dr. Marc Zupan, offered previously undisclosed opinions that should not have been admitted at trial. *Second*, Angstrom argues that Eaton witness Lori Hillman falsely testified in a manner that materially misled the jury.

The parties dispute the standard of review for these objections. Ordinarily, we review a district court's determination regarding the admissibility of witness testimony under the abuse-of-discretion standard. *United States v. Abboud*, 438 F.3d 554, 586 (6th Cir. 2006). But where no objection was made during trial, we review for plain error instead. *Id.* Although the parties dispute whether some of Angstrom's objections were properly preserved, we assume that they were, because even under the abuse-of-discretion standard, none of Angstrom's challenges prevail.

### A.      Dr. Marc Zupan's Testimony

Angstrom challenges Dr. Zupan's testimony on three grounds. *First*, Angstrom argues that portions of Dr. Zupan's rebuttal testimony at trial violated a pretrial motion-in-limine ruling. The district court's motion-in-limine ruling, however, only prohibited Dr. Zupan from filing a rebuttal expert report on the eve of trial; it made no similar determination regarding whether Dr. Zupan could provide rebuttal testimony at trial. Angstrom's challenge therefore fails, as it rests on a faulty characterization of the pretrial ruling.

*Second*, Angstrom argues that Dr. Zupan improperly offered trial testimony that went beyond the scope of his expert report. At trial, Angstrom objected to Dr. Zupan's testimony regarding "shot peening"—a process by which metal is manipulated to make it stronger—which was not discussed in his report. The district court, however, did not abuse its discretion in allowing Dr. Zupan to offer his expert opinions on the topic. *See* Fed. R. Evid. 702. As the district court explained at trial, the parties agreed that their experts could listen to other witnesses' testimony, and because Dr. Zupan possessed knowledge about shot peening and sat through testimony on the topic, he was qualified to offer his expert opinion.

*Third*, Angstrom challenges the admissibility of Dr. Zupan's testimony regarding Eaton's computer-aided design print of the levers as going outside the scope of his expert report.

But contrary to Angstrom's suggestion, Dr. Zupan's expert report does, in fact, discuss Eaton's print, and the specifications that the computer-aided design disclosed. Accordingly, we will not disturb the verdict based on challenges to Dr. Zupan's testimony.

### B. Lori Hillman's Testimony

As to Lori Hillman's testimony, Angstrom argues that the trial was "reversibly unfair" because she offered "false testimony" on the stand. Appellant's Br. at 3, 48. Angstrom's theory at trial was that Eaton was responsible for the warranty spill because it used these levers in its heavy-duty clutches, when it should have been using a stronger kind of lever instead. In support of its theory, Angstrom introduced evidence at trial that almost all of Eaton's clutches that failed during the warranty spill were a model of heavy-duty clutch that had previously been built using the stronger kind of lever. To counter that narrative, Hillman testified that almost all the clutches that Eaton produced during the warranty spill were heavy-duty models, implying that the high number of failures in heavy-duty clutches was attributable to them making up a large share of Eaton's overall production volume during the warranty period, rather than any design defect.

Angstrom argues that Hillman's testimony materially misrepresented the data. While the statistics Hillman provided to the jury may have created some confusion, it is just as plausible that the jury correctly understood the meaning of the data—which was published as an exhibit during trial—or gave the testimony no weight at all. Additionally, Angstrom had the opportunity to cross-examine Hillman on her testimony but chose not to do so. For these reasons, Angstrom has failed to show that the district court erred in admitting Hillman's testimony.

### CONCLUSION

We affirm the district court's denial of Angstrom's motions for judgment on the pleadings, summary judgment, and a new trial.