**UNITED STATES of America, Plaintiff–Appellant,**

**v.**

**M/G TRANSPORT SERVICES, INC., J. Harschel Thomassee, Fred E. Morehead, and Robert S. Montgomery, Defendants–Appellees.**

No. 97–3909.

United States Court of Appeals, Sixth Circuit.

Argued Jan. 26, 1999.

Decided April 22, 1999.

H. Claire Whitney (briefed), James A. Morgulec (argued and briefed), Environmental Crimes Section, U.S. Department of Justice, Environment & Natural Resources Division, Washington, DC, for Plaintiff–Appellant.

Glenn V. Whitaker (argued and briefed), Victor A. Walton, Jr. (briefed), Eric W. Richardson (briefed), Vorys, Sater, Seymour & Pease, Cincinnati, OH, for Defendant–Appellee M/G Transport Services, Inc.

Thomas R. Smith (argued and briefed), Haverkamp, Brinker, Rebold & Riehl, Cincinnati, OH, for Defendant–Appellee J. Harschel Thomassee.

Marc D. Mezibov (argued and briefed), Ted L. Wills (briefed), Sirkin, Pinales, Mezibov & Schwartz, Cincinnati, OH, for Defendants–Appellees Fred E. Morehead and Robert S. Montgomery.

Before: MARTIN, Chief Judge; DAUGHTREY and CLAY, Circuit Judges.

DAUGHTREY, Circuit Judge.

This appeal stems from a federal prosecution of alleged environmental crimes involving the non-permitted discharge of pollutants into the Ohio River from tow boats owned by M/G Transport Services, Inc. After a seven-week trial, a jury convicted M/G Transport and J. Harschel Thomassee, an official with the company, on the charge of conspiracy to violate the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251–1386, popularly known as the Clean Water Act. The jury further convicted M/G Transport and Thomassee of failure to notify the appropriate agencies of the discharge of a harmful quantity of oil from one of the company's vessels, as charged in Count 2 of the indictment. Finally, M/G Transport, Thomassee, and Fred Morehead and Robert Montgomery, captains of M/G Transport vessels, were found guilty of various charges in Counts 4 through 9 entailing the dumping of ash and other pollutants into federal waterways. The district court, however, granted the defendants' motions for judgment of

acquittal on all charges contained in Counts 4 through 9.

The United States now appeals from the dismissal of the charges of dumping pollutants without a permit. Because we hold that sufficient evidence exists in the record to justify a rational finder of fact in concluding that the defendants are guilty of the various charges beyond a reasonable doubt, we reverse the judgment of the district court and remand the case for entry of a judgment of conviction on Counts 4 through 9 and appropriate sentencing on those convictions.

## FACTUAL AND PROCEDURAL BACKGROUND

Trial testimony established that M/G Transport operated tow boats on the Mississippi, Ohio, and Tennessee Rivers, as well as their tributaries. From 1985 until January 1, 1992, Thomassee served in the position of marine superintendent of the company with operational control of all M/G Transport vessels. Furthermore, from 1986 until January 1, 1992, defendant Thomassee also occupied the position of vice-president of operations of M/G Transport.

Other trial witnesses testified regarding the daily life aboard the tow boats. Vessel engineers and assistant engineers stated that the boats accumulated a combination of water, oil, grease, and other materials in the bilges of the vessels. Although the engineers knew they were not to discharge the "bilge slop" overboard if such a discharge would produce a sheen upon the water, they nevertheless did so because there were no places to store the wastewater on board. The witnesses testified, however, that they would dump the "slop" in remote locations on the rivers at night so as to avoid detection.

Evidence offered at trial also indicated that Thomassee exercised ultimate supervision over the operation of the tow boats and that he and the company were aware of the discharge of oil and other pollutants into the waters of the rivers served by M/G Transport. For example, the bilges of the vessels were known to be too small to hold all bilge slop collected during a river run. Nevertheless, Thomassee, the only company official with the authority to have a slop barge offload waste material from the vessels, rarely requested such services. Moreover, Thomassee himself was on one of M/G Transport's vessels when 40 gallons of lube oil leaked into the water. No official aboard the vessel reported the discharge to authorities; instead, the engineer was merely directed to put detergent into the water to help break down the spill.

Numerous other witnesses testified that the tow boats did not carry dumpsters on them prior to the time Thomassee no longer worked for the company. Consequently, the vessels used 55–gallon burn barrels to incinerate any solid waste or debris gathered or generated during time out of port. Every two or three days, the barrels would fill up and deck hands were ordered, as company policy, to dump the ash and unburned material directly into the river. In fact, the barrels themselves eventually outlived their usefulness and were also thrown into the water.

To avoid detection, however, employees were again instructed to dump the contents of the barrels only at night and in remote locations. Defense witnesses sought to intimate that the nighttime dumping was necessitated only because the barrels were required to cool before dumping; however, other testimony belies such motivation. For example, one witness testified that he was advised by M/G Transport's safety instructor not to dump the ashes near cities. Other witnesses testified that they were not to dump the barrel contents when they were on stretches of the rivers where they could be observed by individuals on the shore.

The government also offered the testimony of officials from various regions of the Environmental Protection Agency. Those individuals related that they had

searched the computer files of their offices and found no evidence of permits issued to M/G Transport or to any of the individual defendants to authorize the discharge of any pollutants into the rivers on which M/G Transport vessels operated. In fact, all three witnesses explained that the defendants would not have been able to obtain a permit if one had been requested because of the quality and quantity of the materials that were to be dumped.

The defendants also offered a number of witnesses on their behalf. Included in the testimony provided was evidence from one individual that he had once asked Thomassee to procure a slop barge so that his vessel could offload accumulated waste. According to the witness, Thomassee stated that he would arrange for the barge to remove the waste that same day. Other witnesses related the commonplace nature of burn barrels on river vessels, even on boats operated by the United States Coast Guard, the agency charged with policing inland waterways. Some of those same witnesses also offered their opinions that the dumping of waste ash into the water was not only necessary, but actually beneficial to water quality.

The jury obviously placed little credence in the defendants' witnesses and theories. At the conclusion of their deliberations, the jurors convicted M/G Transport and Thomassee on Count 1 of conspiracy to violate the Clean Water Act by discharging oil into the rivers in harmful quantities. The jury also convicted the company and Thomassee on Count 2 for knowingly failing to report to the appropriate agency an oil spill from the M/V Richard A. Hain on July 2, 1990. All defendants were acquitted, however, on the charge in Count 3 that they *conspired* to discharge plastics and other pollutants into the Ohio River.

Although the *conspiracy* charge based upon the dumping of the ash generated in the burn barrels resulted in acquittals for all defendants, the jury still found the company, Thomassee, and the tow boat captains guilty of discharging that waste or of aiding and abetting such discharge. Specifically, M/G Transport, Thomassee, and Captain Montgomery were convicted on the charges in Counts 4 and 5 that pollutants were discharged without a permit on or about specified dates from the M/V Maurice F. Alverson and the M/V Richard A. Hain. M/G Transport, Thomassee, and Captain Morehead were convicted in Counts 6 and 7 on charges that they discharged pollutants without a permit on or about other specified days from the M/V Richard A. Hain. Finally, M/G Transport and Morehead alone were convicted of further non-permitted discharges from the M/V Richard A. Hain on or about still other listed dates.

Post-trial, the defendants moved for judgments of acquittal on all convictions. The district court denied those motions insofar as they related to the charges leveled in Counts 1 and 2 of the indictment. The court did, however, grant the motions for judgments of acquittal on Counts 4 through 9 on two separate bases. First, the district judge concluded that the government had failed to adduce sufficient evidence to prove that the specific crimes charged to have been perpetrated by M/G Transport and Thomassee were committed on or about the dates alleged, or that "Morehead or Montgomery participated in an act to materially assist the commission of the specific crime alleged" in each of Counts 4 through 9. Second, relying upon the case of *United States v. Dalton,* 960 F.2d 121 (10th Cir.1992), the district court decided that principles of due process precluded holding the defendants criminally liable for discharging pollutants without a permit when no permit would ever have been issued to allow the level of pollution the defendants sought to discharge. M/G Transport and Thomassee do not contest the denial of their motions for judgment of acquittal on Counts 1 and 2. The government, however, seeks reinstatement of the convictions returned by the jury in Counts 4 through 9.

## DISCUSSION

### Alleged Due Process Violation

 The United States first insists that the district court's reliance upon the Tenth Circuit's decision in *Dalton* to reverse the convictions on Counts 4 through 9 is misplaced. In *Dalton,* the defendant, an attorney, accepted a firearm as a fee from a client. Unfortunately, the client had converted the weapon into a machine gun in 1989, three years after the effective date of a federal statute prohibiting the possession of any machine gun made after 1986. *See* 18 U.S.C. § 922(*o*). *See Dalton,* 960 F.2d at 122. Dalton was not convicted under that 1986 law, however. Rather, the government prosecuted him under the National Firearms Act, I.R.C. §§ 5861(d) and (e), for the possession of and the transferring of an unregistered firearm. In ruling upon Dalton's appeal from those convictions, the Tenth Circuit held that principles of due process mandated reversal of the district court's judgment because Dalton was being prosecuted for failing to register a firearm that, by law, could not be registered under any circumstances. *Id.* at 122–24.

The district court in this case concluded that *Dalton*'s rationale also dictates the dismissal of the charges contained in Counts 4 through 9 of the indictment returned against the defendants. The court ruled that the prosecution of the defendants for discharging pollutants into the river without a permit placed them in a classic "Catch 22" situation, because those defendants could never have received a permit for the very discharges that sparked the charges against them. On appeal, the United States urges this court not to adopt the teachings of *Dalton,* both because other courts of appeals have subsequently rejected *Dalton*'s analysis and because adherence to such principles would seriously undermine all criminal enforcement of environmental regulations.

We find it unnecessary to address the applicability of *Dalton* in resolving the due process issue presented to the district court, because the perceived problems present in Dalton's prosecution are simply not implicated in this matter. As noted by the Tenth Circuit, Dalton was prosecuted for not obtaining a permit that, by law, could never be issued. In contrast, the issuance of permits for the discharge of pollutants is an integral part of the regulatory scheme of the Clean Water Act. Significantly, and contrary to the assumptions made by the district court and the defendants in this case, the prosecution's regional EPA witnesses did *not* testify that permits could never be issued for any controlled discharge of pollutants into the nation's rivers. Instead, officials from various regional offices testified only that the sheer quantity of pollutants the defendants dumped would not have been allowed and that pollutants that are not processed properly will not be tolerated. Such a scenario is qualitatively different from that presented in *Dalton.*

Moreover, we agree with the government's contention that affirming the district court's due process decision would cause unwarranted havoc in the legal community. As argued by the United States in its brief:

> Companies that obtain permits could continue to be prosecuted for failing to comply with them, but those who choose not to apply for permits at all could *only* be prosecuted if a court determines post-hoc that they could have received one. It follows that businesses would have an incentive *not* to obtain permits prior to discharging pollutants; and businesses that discharge pollutants would have an incentive to make those discharges so egregious in magnitude, duration, and toxicity that no permitting authority would ever allow them.

### Sufficiency of the Evidence

 In addressing the sufficiency of the evidence adduced at trial to support the convictions entered on Counts 4 through 9 of the indictment, we do not weigh the

evidence presented, consider the credibility of witnesses, or substitute our judgment for that of the jury. *See United States v. Hilliard,* 11 F.3d 618, 620 (6th Cir.1993). Instead, we are called upon to determine merely whether, after viewing the evidence in the light most favorable to the prosecution, *and after giving the government the benefit of all inferences that could reasonably be drawn from the testimony,* any rational trier of fact could find the elements of the crime beyond a reasonable doubt. *See Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

### 1. Defendants M/G Transport and Thomassee

■ According proper deference to the inferences drawn by the jury in favor of the government, we find, beyond a reasonable doubt, that sufficient evidence supports the convictions of defendant M/G Transport on Counts 4 through 9 and defendant Thomassee on Counts 4 through 7. As explicitly found by the district court in ruling upon the defendants' motions for judgment of acquittal, "[t]aking all reasonable inferences in favor of the Government, . . . there was sufficient evidence for the jury to find beyond a reasonable doubt that M/G and Thomassee routinely caused the discharge of pollutants without a permit into the navigable waters of the United States." The district court granted the motions for judgment of acquittal as to M/G Transport and Thomassee, however, because of its belief that "the Government did not present sufficient evidence as a matter of law to find that the specific crime charged in each of Counts Four through Nine was committed *on or about the dates alleged in that Count.*" (Emphasis added.)

■ Counts 4 through 9 of the indictment alleged individual acts of non-permitted discharges of pollutants into the waters of the United States "on or about" specified dates. "When 'on or about' language is used in an indictment, proof of the exact date of an offense is not required as long as a date reasonably near that named in the indictment is established." *United States v. Ford,* 872 F.2d 1231, 1236 (6th Cir.1989). We conclude, after careful review of the record, that in each instance described in the indictment, the government did indeed meet its evidentiary burden.

Uncontroverted testimony established that M/G Transport's tow boats, at the time of the events alleged in the indictment, were not equipped with dumpsters or other means for storing the normal, daily, solid waste accumulated on the boats. Consequently, the boats utilized burn barrels into which discarded parts, garbage, rags, and other refuse would be deposited and then incinerated. When the burn barrels were filled with ash and other residue, the deck hands would unceremoniously empty the drums into the water. Moreover, the district court recognized that "[i]t was also a reasonable inference for the jury to make based on the testimony of Government witnesses that when the [captains'] logs reflected that a barrel of trash was burned it was usually dumped into the river within a short amount of time thereafter." In fact, an assistant engineer, George Wamsley, testified that burn barrels were dumped every two to three days. Another government witness related that the contents of the burn barrels would be dumped into the river no less frequently than every three days. Thus, log entries showing trash burnings on the dates listed in the various counts of the indictment provided sufficient evidence for a rational trier of fact to conclude beyond a reasonable doubt that the contents of those barrels were dumped, without a permit, into the river "on or about" that date.

■ M/G Transport and Thomassee insist, nevertheless, that their convictions on Counts 4 through 9 cannot be sustained because no evidence was adduced to establish the nature of the items burned in the specific burn barrels that were the sub-

jects of the various allegations. According to the defendants, without such evidence, the prosecution cannot satisfactorily establish that "pollutants" were dumped into the river. The term "pollutant" is, however, very broadly defined in the Clean Water Act. Pursuant to the relevant provisions of 33 U.S.C. § 1362(6), " 'pollutant' means dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water." Trial testimony that "trash" (Count 4), "garbage" (Count 5), "lube oil filters" (Count 6), "trash" (Count 7), "trash" (Count 8), and "dirty filters" (Count 9) were burned on the days listed in the various counts of the indictment is thus sufficient to allow the jury to draw an inference that any residue remaining in the barrels was a "pollutant." Sufficient evidence was thus presented to justify a rational trier of fact in finding M/G Transport guilty beyond a reasonable doubt of the offenses listed in Counts 4 through 9 and defendant Thomassee guilty beyond a reasonable doubt of the offenses listed in Counts 4 through 7 of the indictment.

## 2. Defendants Morehead and Montgomery

■ In granting motions for judgments of acquittal in favor of defendants Morehead and Montgomery, the district court ruled that the jury could reasonably infer that the two captains knew that pollutants were dumped from their vessels on some occasions. The court further stated, however, that the evidence was insufficient to establish the captains' ability to alter company policy regarding the non-permitted discharge of the barrel contents, their knowledge of the contents of the burn barrels on or about the dates alleged in the indictment, or their knowledge of the illegality of their actions.

Initially, the position of the district court seems persuasive. Faced with crowded conditions on vessels away from home ports for long stretches of time, the captains of the M/G Transport tow boats appeared to have no alternatives but to burn all generated refuse and deposit the unburned remainder and ash into the water. Although company officials and the company itself should and did bear responsibility for such premeditated, egregious, environmental violations, it may strike some as harsh also to punish the vessel captains for following what evidence intimates was, unfortunately, merely the custom on the nation's waterways.

Contrary to the district court's interpretation of the testimony, however, we conclude that sufficient evidence was offered to support the convictions of defendants Morehead and Montgomery. First, while it is true that the captains neither developed policy for M/G Transport concerning disposal of wastes nor personally dumped the residue of the burn barrels into the rivers, the jury could reasonably infer that those defendants knew that illegal dumping of pollutants was occurring. The captains' logs clearly indicated that garbage, filters, and trash were being burned in barrels aboard M/G Transport vessels. That evidence, together with the uncontroverted testimony that the remnants of those burnings were dumped into the water within two or three days of the burnings and that no other method of waste disposal was readily available on the vessels, justified a rational trier of fact in concluding beyond a reasonable doubt that the captains were aware of the dumping "on or about" the dates specified in the indictment. Furthermore, the jury could have concluded that the captains were aware of the illegality of the dumping activities from the testimony that the burn barrels were dumped at night in remote locations and out of the view of cities and other populated areas.

Finally, the defense's own testimony undermines the captains' argument that they

should not be held liable for any dumping because they had no alternatives to the discharge of pollutants into the rivers. Wayne Johnson, a M/G Transport employee, testified that he once requested of defendant Thomassee a slop barge to offload waste water from his vessel and that Thomassee assured him that such service would be provided that same day. · Consequently, knowing that the dumping of the contents of the burn barrels was illegal, the captains, like Johnson, could have insulated themselves from liability by requesting Thomassee to provide them with slop barges or other vessels that could take their refuse for proper disposal. Their failure to do so justified the jury's determination that they were responsible for the illegal dumping of pollutants into the waterways.

### CONCLUSION

For the reasons set out above, we conclude that the judgment of the district court as to Counts 1, 2, and 3 of the indictment should be AFFIRMED, but that the judgments of acquittal on Counts 4 through 9 must be REVERSED and the case REMANDED for entry of judgment and sentencing in accordance with the verdicts rendered by the jury in this matter.