**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 08a0455n.06
Filed: August 1, 2008

**No. 04-4474**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| DANNY N. GARLAND, | ) | NORTHERN DISTRICT OF OHIO |
| | ) | |
| Defendant-Appellant. | ) | |

**Before: DAUGHTREY, GILMAN, and ROGERS, Circuit Judges.**

**ROGERS, Circuit Judge.** This case is part of a consolidated appeal involving thirteen defendants who were members of the Outlaw Motorcycle Club ("OMC"), an international motorcycle club with chapters across the country and around the world. In 1997, the Federal Bureau of Investigation and state law enforcement agencies began an investigation into the Green region of the OMC, which consists of chapters in Dayton, Ohio; Fort Wayne, Indiana; Louisville, Kentucky; Indianapolis, Indiana; and Oklahoma City, Oklahoma. As a result of the investigation, a grand jury in the Northern District of Ohio returned a 40-count indictment in 2003 charging the defendants with various federal offenses, including Racketeer Influenced and Corrupt Organizations Act ("RICO"), drug trafficking, and firearms offenses. The defendants were tried together before an anonymous jury.

Defendant Danny N. Garland was a member of OMC's Indianapolis and Louisville chapters. Following trial, Garland was convicted of one count of substantive RICO, in violation of 18 U.S.C. § 1962(c), one count of RICO conspiracy, in violation of 18 U.S.C. § 1962(d), and one count of conspiracy to possess with intent to distribute narcotics, in violation of 21 U.S.C. § 846. With respect to the RICO charges, the jury found that Garland committed Racketeering Acts 1(A) and 18.[1] On October 27, 2004, Garland was sentenced to 96 months' imprisonment on all counts, to run concurrently.

Garland makes several contentions on appeal: (1) that the evidence was not sufficient to convict him on all counts; (2) that the admission at trial of a confidential informant's statement regarding Garland's involvement in drug trafficking activity violated the Confrontation Clause; (3) that the admission at trial of evidence related to the alleged disappearance of Shannon Turner, the former girlfriend of OMC member David Mays, constituted an abuse of discretion on the part of the district court; and (4) that the district court erred by enhancing his sentencing offense level by two

---

[1]Racketeering Act 1(A) alleged that Garland "combine[d], conspire[d], confederate[d] and agree[d]" with other members of the OMC to distribute and possess with intent to distribute various narcotics. Racketeering Act 18 alleged:

> On or about May 14, 1999, in the Northern District of Ohio, Western Division, and elsewhere, GLEN D. CARLISLE and DANNY N. GARLAND, defendants herein, did unlawfully transport and cause to be transported in interstate commerce, from the State of Indiana to the State of Ohio, a motor vehicle, to wit, a motorcycle bearing vehicle identification number 1HD1GEL13PY309621, a 1993 Harley Davidson Dyna Wide Glide, knowing that the motorcycle had been taken by fraud, in violation of Title 18, United States Code, Section 2314.

levels for possession of a weapon and by refusing to grant him a downward departure for inadequacy of criminal history. For the reasons that follow, none of those contentions has merit.

**I.**

Initially, we conclude that the evidence adduced at trial was sufficient to convict Garland on all counts. This court reviews de novo the sufficiency of the evidence to sustain a conviction. *United States v. Gibson*, 896 F.2d 206, 209 (6th Cir. 1990). Evidence is sufficient to sustain a conviction if "after viewing the evidence in the light most favorable to the prosecution, *and after giving the government the benefit of all inferences that could reasonably be drawn from the testimony*, any rational trier of fact could find the elements of the crime beyond a reasonable doubt." *United States v. M/G Transp. Servs., Inc.*, 173 F.3d 584, 589 (6th Cir. 1999) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). In examining claims of insufficient evidence, this court does not "weigh the evidence presented, consider the credibility of witnesses, or substitute [its] judgment for that of the jury." *Id.* at 588-89.

Garland first contends that the evidence was not sufficient to establish that he conspired to traffic in narcotics. This claim goes to both the sufficiency of the evidence for Garland's conviction under 21 U.S.C. § 846 and to the government's proof of Racketeering Act 1(A). To prove a narcotics conspiracy under 21 U.S.C. § 846, the government must prove beyond a reasonable doubt "(1) an agreement to violate drug laws, (2) knowledge and intent to join the conspiracy, and (3)

participation in the conspiracy." *United States v. Gibbs*, 182 F.3d 408, 420 (6th Cir. 1999) (quoting

*United States v. Welch*, 97 F.3d 142, 148 (6th Cir. 1996)). "Proof of a formal agreement is not

required to establish a conspiracy; 'a tacit or material understanding among the parties' is sufficient."

*United States v. Henley*, 360 F.3d 509, 513 (6th Cir. 2004) (quoting *United States v. Pearce*, 912

F.2d 159, 161 (6th Cir. 1990)).

Contrary to Garland's assertion, the evidence adduced at trial, construed in the light most

favorable to the government, was sufficient to convict Garland of participating in a conspiracy to

distribute narcotics. At trial, James Dilts, a former probationary member of the OMC, testified with

respect to an OMC party that occurred in 1999. Dilts testified that, during the party, Frank Wheeler,

then the Green region boss, proposed that Dilts and other OMC probationary members sell

methamphetamine to pay dues and meet other OMC obligations. Dilts testified that fifteen to twenty

minutes after this conversation with Wheeler, Garland offered to provide Dilts with

methamphetamine for $ 2,300 per ounce. Dilts also testified that he witnessed Garland handing out

small quantities of cocaine to various members in the Louisville clubhouse in November 1999.

Catherine Solgot, Garland's ex-girlfriend, testified that she lived with Garland for approximately

three years beginning in October 1997, and that Garland was a member of the OMC during that time.

Solgot testified that during that period Garland obtained drugs at various times and at various

quantities from OMC members Frank Wheeler and John Walker, the latter being a former president

of the Indianapolis chapter. Solgot testified that Garland was regularly involved in dealing drugs,

including cocaine, pills, and marijuana, and that she sold drugs for him. Finally, Earl Logsdon, a

member of the Louisville chapter of the OMC, testified that Garland once offered him fourteen to sixteen pounds of marijuana.

This evidence is sufficient to allow a rational trier of fact to find beyond a reasonable doubt the elements of conspiracy to traffic drugs. The evidence indicates that Garland and other members of the OMC knowingly and intentionally entered into and participated in at least a tacit agreement to violate the drug laws. The circumstances surrounding the encounter at the party between Dilts, Wheeler, and Garland, and the frequency with which Garland distributed drugs purchased from Walker and Wheeler, as testified to by Solgot, sufficiently indicate a conspiracy among OMC members, including Garland, to violate the drug laws. The evidence is also sufficient to support the jury's determination that Garland committed Racketeering Act 1(A).

Second, Garland argues that the evidence at trial was not sufficient to establish the substantive RICO count because Garland's alleged involvement in the interstate transportation of a motorcycle obtained through fraud was not related to the criminal enterprise alleged in the indictment. The government charged this conduct as Racketeering Act 18 and, to prove that Garland engaged in a "pattern of racketeering activity," the government must prove not only that Garland committed the predicate act, but also that the predicate act is sufficiently related to the other predicates charged against Garland. *See H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989). This circuit has held that this "relationship or relatedness" requirement can be satisfied by proof that: "(1) the defendant was enabled to commit the offense solely by virtue of his position in the enterprise; or (2) the offense was related to the activities of the enterprise." *United States v.*

*Corrado*, 227 F.3d 543, 554 (6th Cir. 2000) (quoting *United States v. Locascio*, 6 F.3d 924, 943 (2d

Cir. 1993)). Thus, the "predicate acts do not necessarily need to be directly interrelated; they must,

however, be connected to the affairs and operations of the criminal enterprise." *Id.*

The record contains evidence sufficient to prove that Garland's involvement in the interstate

transportation of a fraudulently obtained motorcycle was connected to the activities of the OMC

enterprise charged in the indictment. At trial, James Dilts testified that on May 14, 1999, he traveled

with OMC member Glen Carlisle to the Louisville chapter to discuss the sale of a motorcycle with

Garland. Garland told Dilts that Garland had obtained the motorcycle through insurance fraud.

Subsequently, Dilts and Carlisle drove to Indianapolis, obtained the motorcycle from Garland, and

transported the motorcycle to Dayton, Ohio. Dilts paid Garland $ 4,000 for the motorcycle on May

17, 1999. Dilts and Carlisle later disassembled the motorcycle in Dilts's garage and removed

identifiable parts.

Other testimony in the record establishes a connection between this sale of the fraudulently

obtained motorcycle and the activities of the OMC enterprise. At trial, OMC member Earl Logsdon

testified that Garland also once delivered a stolen "Springer" Harley-Davidson motorcycle for

Logsdon. Although this sale was not charged as a racketeering act in the indictment, it serves as

evidence that Garland's sale to Dilts was not an isolated incident. Further, James Dilts testified that,

on the trip to Indianapolis to pay Garland for the tainted motorcycle, he and Carlisle discussed the

fact that OMC member Al Lawson also possessed a stolen motorcycle. And Gary Watkins, yet

another OMC member, testified about a conversation that he had had with Danny Hedges, a fellow

OMC member, regarding the sale of stolen motorcycles for a price of $ 3,500. This evidence is sufficient to allow a reasonable juror to infer that members of the OMC enterprise dealt in stolen motorcycles as a matter of course. And the jury could reasonably infer that one of the purposes of dealing in stolen motorcycles was to allow OMC members to fulfill their financial obligations to the club. Accordingly, sufficient evidence was introduced at trial to establish the requisite relationship between Garland's sale of the tainted motorcycle and the activities of the OMC enterprise.

Third, Garland argues that the evidence at trial was not sufficient to convict him of RICO conspiracy.

> When exercising appellate review of the sufficiency of the evidence to support a RICO conspiracy conviction, we must first determine if a conspiracy existed and then whether the defendant was a member of that conspiracy. Defendants' agreement to participate in the RICO conspiracy may be inferred from their acts. Thus, for the RICO conspiracy counts, the government need not prove that each defendant personally committed two racketeering violations or overt acts in furtherance of the conspiracy.

*United States v. Hughes*, 895 F.2d 1135, 1141 (6th Cir. 1990) (citations omitted). The evidence at trial was sufficient to convict Garland of the RICO conspiracy count. Based on the evidence detailed above, a rational trier of fact could conclude, beyond a reasonable doubt, that Garland agreed to participate in the affairs of the OMC through a pattern of racketeering activity. Indeed, Garland's agreement can be inferred through his actions. Testimony at trial established that Garland repeatedly received narcotics from Wheeler and Walker and distributed those narcotics to various individuals, including other OMC members. Testimony also established that Garland was involved in the sale

of a fraudulently obtained motorcycle, and that the sale of the motorcycle was sufficiently connected to the affairs of the OMC enterprise. Thus, ample evidence exists from which the jury could find that Garland conspired with other members of the OMC to violate the RICO statute. *Cf. United States v. Starrett*, 55 F.3d 1525, 1549 (11th Cir. 1995) (holding that because evidence was sufficient to support defendants' substantive RICO convictions, and because the jury could infer from the evidence that defendants each agreed to participate in the affairs of the RICO enterprise through a pattern of racketeering activity, the evidence was sufficient to support defendants' convictions for RICO conspiracy).

For the foregoing reasons, the evidence at trial was sufficient to convict Garland on all counts.

## II.

Although review of the record indicates that Garland's confrontation rights were violated by the admission at trial of a confidential informant's out-of-court declaration that Garland was a "large scale drug trafficker," any error in this regard was harmless given the overwhelming evidence introduced at trial of Garland's participation in drug trafficking activities.

Garland argues that his rights under the Confrontation Clause of the Sixth Amendment were violated when a detective testified at trial that a confidential informant provided the detective with information that Garland was a "large scale drug trafficker in Louisville, Kentucky." Detective Rod Seelye was the first witness called by the government. On direct examination, Detective Seelye

testified that he was involved in an investigation of the drug activities of Garland and other members of the Louisville OMC chapter. Seelye testified that, based on information received from a confidential informant, he and his partner, John Lewis, conducted surveillance of Garland's residence. On June 19, 2002, Seelye observed Tony Tucker, another OMC member, arrive at Garland's home. After a short period of time, Tucker exited the residence and left in a brown Lincoln. Seelye and Lewis followed Tucker and initiated a traffic stop after Tucker failed to signal a turn, a traffic violation under Kentucky law. During the stop, the officers recovered a large quantity of methamphetamine. Following the encounter with Tucker, Seelye and Lewis decided to obtain a search warrant for Garland's home. While Lewis went to procure the warrant, Seelye returned to Garland's home and reinitiated surveillance. A short time later, Garland and his girlfriend left the residence on Garland's motorcycle. Seelye followed and initiated a traffic stop after Garland failed to signal a turn. During the stop, the officers recovered a pistol and a waterproof matchbox with a straw. The matchbox contained .477 grams of cocaine. Thereafter, Seelye transported Garland and his girlfriend back to Garland's home where they waited until Lewis returned with the search warrant. When Lewis arrived, the officers conducted a search of Garland's home that yielded two weapons, $ 20,000 in cash, two scales, including a digital scale and a triple beam scale, and a container with narcotics residue.

On cross-examination, counsel for Garland questioned Seelye regarding both the stop of Tucker and the stop of Garland. The exchange continued as follows:

Q:  And you indicated that based upon your stop of Tony Tucker, your partner went and got a search warrant for the house of Danny Garland?

A:  Could you repeat the question, sir?

Q:  I believe it was your testimony, was it not, that based upon your stop of Tony Tucker and the drugs that you found on him, you then went and got a search warrant?

A:  That wasn't the only thing that was in the search warrant as far as independent investigation, but yes, after we stopped Mr. Tucker leaving the residence, that's when we obtained a search warrant for Mr. Garland's residence.

Q:  It would certainly be accurate, would it not, that you had been surveilling his house for approximately a month?

A:  Yes, sir.

Q:  And you never went and got a search warrant before you stopped Tony Tucker, did you?

A:  No, sir.


Q:  And you indicated that you pulled Mr. Garland over for a traffic offense?

A:  That, coupled with what we already knew from the arrest of Mr. Tucker.

Q:  Well, I believe it was your testimony - -

A:  He also - -  he did do - - commit a traffic violation, but also he was - - it was coupled with the information we had anyway.


On re-direct, the government questioned Seelye as follows:


Q:  Early on, you were asked about the reasons for your stop of Mr. Garland, correct?

A:  Yes, sir.

Q:  You indicated, in fact, you observed that Mr. Garland in riding the motorcycle, did not make a turn; is that right?

A:  Yes, he didn't indicate.

Q:  He made a turn but he didn't indicate the turn?

A:  Yes, sir.

Q: I'm sorry. You had other information in your possession at that point with regards to Mr. Garland, did you not?

A: That's correct.

Q: You had seen Mr. Tucker leave Mr. Garland's house, right?

A: Yes, sir; that's correct.

Q: And in addition, you had obtained information through the investigation prior to that date, correct?

A: Yes, sir. That was why we were there.

Q: What information had you had in your possession prior to that date regarding Mr. Garland?

A: That Mr. Garland was involved --

    Mr. Grant: Objection.

    Mr. Wilson: I believe the door was opened by the question, Your Honor.

    The Court: Sustained - - overruled. My apology.

Q: What was the information you had with regard to Mr. Garland?

A: That Mr. Garland was a large scale drug trafficker in Louisville, Kentucky.

Q: What was the source of that information?

A: From a confidential source providing that to us.

This court has held, following *Crawford v. Washington*, 541 U.S. 36 (2004), that the admission at trial of a testimonial, out-of-court statement from a confidential informant, offered to establish the truth of the matter asserted, violates the Sixth Amendment when the defendant is not provided an opportunity to cross-examine the confidential informant. *See United States v. Hearn*, 500 F.3d 479, 484 (6th Cir. 2007); *United States v. Cromer*, 389 F.3d 662, 677-78 (6th Cir. 2004). There is little doubt here that the statement from the confidential informant relating that Garland "was a large scale drug trafficker in Louisville, Kentucky" is testimonial in nature, *see Cromer*, 389

F.3d at 675, and it is undisputed that Garland did not have the opportunity to cross-examine the confidential informant. Acknowledging this, the government principally contends that the statement was not offered to establish the truth of the matter asserted. Rather, the government argues, the statement was elicited to "rebut defense cross-examination which implied that the search warrant for Garland's residence was based solely on the evidence the police derived from the stop of Tony Tucker" and "to rebut cross examination of Det. Seelye that attempted to limit law enforcement's reasons for stopping Garland."

Whether Garland's confrontation rights were violated in this case is a close question. On the one hand, the government's second explanation—that the testimony was elicited not to prove that Garland was a large-scale drug trafficker, but to rebut the cross-examination of Detective Seelye that attempted to limit the reasons for stopping Garland to the traffic violation—is a potentially reasonable one.[2] This court has acknowledged that prosecutors may, in an effort to limit jury concerns about the reasons for police actions, elicit testimony regarding how officers stopped a suspect in response to statements from confidential informants, so long as the government takes reasonable, or even minimal, steps to limit the testimony. *Hearn*, 500 F.3d at 483-84. The record indicates that counsel for Garland questioned Seelye's authority for stopping Garland on a mere

---

[2]The government's contention that the testimony was also elicited to "rebut defense cross-examination which implied that the search warrant for Garland's residence was based solely on the evidence the police derived from the stop of Tony Tucker" is belied by the record. Nowhere in the relevant exchange did the government seek to bolster Seelye's testimony regarding the information that allowed the officers to procure a search warrant for Garland's home. The exchange is cast exclusively in terms of the reason for the traffic stop of Garland.

traffic violation, and that the government did not elicit the testimony at issue until after that questioning occurred.  Indeed, the record indicates that the government, during direct examination, took care to ensure that Seelye *did not* testify to the specifics of what the confidential informant had told police.  *See* JA 3300 (Q:  How did [the investigation of Garland] begin? A: We received information. Q: Did that come from what we would call an informant?  A: Yes, it did, sir.  Q:  And had you worked with this informant in the past?  A:  Yes.  Q:  And *without telling us what the informant said*, where did you end up on June 19?).

On the other hand, it was simply not necessary for Seelye to testify that the informant had related that Garland was a "large scale drug trafficker." Because Garland was on trial for drug trafficking, and because drug trafficking was one of the predicate acts charged under the substantive RICO count, the statement went to the very heart of the government's case against Garland.  *Cf. Hearn*, 500 F.3d at 484-85.  It would have sufficed for Seelye to testify that Garland was tied to "some illegal activity," *see id.* at 484, and the record indicates that the government failed to make any effort to limit Seelye's response in phrasing the question as it did.  Further, it is not clear that rehabilitation was necessary with respect to Seelye's cross-examination testimony regarding the reasons for stopping Garland.  In response to defense counsel's question, Seelye stated rather clearly that the stop was not based exclusively upon the traffic violation, s*ee* JA 3348 ("it was coupled with the information we had anyway"), and the need for a further, more detailed explanation on re-direct was not at all apparent.  Thus, on balance, the record demonstrates that the government offered the confidential-informant statement to prove the truth of the matter asserted, rather than for the reasons

argued by the government on appeal. Admission of the confidential informant's statement therefore violated Garland's confrontation rights.

Nevertheless, the admission of the confidential informant's statement was harmless. As discussed, the government introduced ample evidence from which a rational trier of fact could find beyond a reasonable doubt that Garland engaged in a conspiracy to distribute large amounts of narcotics. Though Garland asserts that the jury could have concluded that he was a mere recreational user of drugs, the record indicates otherwise. The testimony of Garland's girlfriend Solgot and OMC members Dilts and Logsdon was sufficient to support the jury's conclusion that Garland dealt in large quantities of drugs and large sums of money. This is especially so in light of the triple beam and digital scales recovered in Garland's home, and Seelye's testimony that such devices are regularly used to traffic in large amounts of narcotics. *See* JA 3363 ("If you've got a set of triple beams, you are a drug dealer that is weighing a lot of dope."). Accordingly, there is no reasonable possibility that the government's brief, single use of the informant's statement made a difference to the jury. *Cf. United States v. Savoires*, 430 F.3d 376, 382 (6th Cir. 2005).

**III.**

The district court also did not abuse its discretion in admitting at trial the evidence of Shannon Turner's disappearance. *See United States v. Wheaton*, 517 F.3d 350, 364 (6th Cir. 2008) (standard of review). Garland argues that the admission of evidence regarding the murder of Shannon Turner, the former girlfriend of OMC member David Mays, was improper because it

unfairly surprised Garland, and because no evidence exists to connect the murder to the criminal enterprise alleged. The murder of Shannon Turner was charged as part of the substantive RICO count against David Mays, not Garland, as Racketeering Act 24.[3]

At trial, Garland's ex-girlfriend Catherine Solgot testified that she knew Shannon Turner as Mays's girlfriend in the fall of 1997. Solgot testified that on December 5, 1997, Mays came to Garland's and Solgot's home in the early morning and appeared to be upset and crying. Mays slept on the couch in the garage and at 11:00 a.m. the next day, Garland and Mays left the house. Solgot testified that, before leaving, Garland appeared upset and worried, and instructed Solgot to stay at home. Solgot stayed home until 7:00 p.m., when OMC member Frank Wheeler called to tell her that Garland and Mays were running late. Solgot left for work, and Garland called her at midnight to ask her to stop on the way home to buy rubbing alcohol. When Solgot asked Garland what the alcohol was for, Garland responded that it was for rubbing gunshot residue off of hands. Solgot testified that when she arrived home, Garland was muddy, tired and upset. Solgot testified that she did not see Shannon Turner again after the incident.

Prior to Solgot's testimony, counsel for Garland requested to approach the bench. In a side-bar discussion, counsel asked to make an oral motion in limine with respect to Solgot's expected

---

[3]Racketeering Act 24 alleged:

On or about December 3, 1997, in Marion County, Southern District of Indiana, DAVID F. MAYS did knowingly and intentionally kill another human being, to wit: Shannon Turner, in violation of Indiana Code Section 35-42-1-1(1).

testimony. Specifically, counsel stated: "We expect some highly prejudicial statements to come out from [Solgot] indicating that [Garland] is somehow connected into this alleged Shannon Turner disappearance, Your Honor." Counsel noted that Garland had not been charged with the disappearance of Turner as a predicate act. After the government responded that the incident was relevant to show that Garland was part of a conspiracy, the court determined that the evidence was admissible:

> As was explained when Mr. Klucas was at side-bar recently, it is my expectation, merely as the judge from what has been explained to me on the record, that this witness will testify as to an association with respect to the Shannon Turner disappearance as between Mr. Garland and Mr. [Mays]. Not for the purpose of establishing the predicate act, but for the purpose of showing the relationship between and among members of the same Outlaw Motorcycle Club.

The government then clarified that its purpose for introducing Solgot's testimony with respect to Turner's disappearance was both to establish participation and association in the enterprise and to prove Racketeering Act 24 against Mays. After direct examination of Solgot but before cross-examination, counsel for Garland informed the court that he would make a motion for mistrial on the basis of *United States v. Davidoff*, 845 F.2d 1151 (2d Cir. 1988). The district court denied the motion without prejudice.

On appeal, Garland again relies on the Second Circuit opinion in *Davidoff*, contending that the evidence linking Garland to Turner's disappearance came as a "complete surprise" to the defense, and that the evidence is irrelevant to the criminal enterprise alleged by the government. As an initial matter, the *Davidoff* case is not directly on point. In that case, the defendant was charged with one

count of RICO conspiracy and four counts of extortion offenses. 845 F.2d at 1153. The RICO conspiracy count alleged a pattern of racketeering activity through acts of extortion and unlawful payments to unions, and further alleged that it was part of the conspiracy to commit extortion offenses, including but "not limited to" the four counts of extortion set out in the indictment. *Id.* Prior to trial, defendant moved for a bill of particulars asking the government to "state with particularity the unspecified violations indicated [in the RICO conspiracy count] by the phrase 'but were not limited to.'" *Id.* The government opposed the request and the district court denied this aspect of defendant's bill of particulars request. *Id.* At trial, the government was permitted to introduce evidence of extortions—that were not explicitly identified in the indictment—as "other acts of racketeering." *Id.* The defendant objected and the district court overruled the objection, indicating that the evidence of extortions not alleged in the indictment presented proof of the existence of the RICO enterprise. *Id.* at 1153-54. On appeal, the Second Circuit held that the district court erred in not granting the defendant's request for a bill of particulars. The court concluded that it was unrealistic to think that the defendant had a fair opportunity to defend against allegations of extortions not made prior to trial. *Id.* at 1154.

Garland's case differs from *Davidoff* in one important respect. The unspecified allegations of extortion introduced by the government in *Davidoff* were found nowhere in the indictment. The allegations were introduced at trial pursuant to the indictment's general statement that the relevant extortion offenses were "not limited to" the four extortion counts listed in the indictment. As a result, the indictment gave defendant warning that other extortion acts might be introduced at trial,

but no notice with respect to what those extortion acts might be. Here, the murder of Turner was alleged as Racketeering Act 24 in the indictment. Although only Mays was charged with that racketeering act, the indictment certainly gave Garland notice that the events surrounding Turner's disappearance would be raised as an issue at trial.

Moreover, there were two proper reasons for introducing the testimony regarding Turner's disappearance, including Garland's alleged involvement. First, the testimony was direct evidence of a racketeering act charged against Garland's co-defendant, David Mays. Garland's participation with Mays in the events of December 5, 1997 was an integral part of Solgot's testimony, and it is difficult to imagine that Solgot's testimony could have retained any narrative integrity without mention of Garland's role. In *Old Chief v. United States*, 519 U.S. 172, 187-88 (1997), the Supreme Court eloquently explained the importance of narrative integrity in admissibility determinations.

Second, the testimony also tended to prove the existence of the RICO enterprise alleged by the government. The testimony is therefore not, as Garland contends, inadmissible "other acts" evidence under Rule 404(b). *See United States v. Miller*, 116 F.3d 641 (2d Cir. 1997). In *Miller*, the Second Circuit rejected a similar Rule 404(b) argument and upheld the admission of evidence of murders that were not charged in the indictment in a RICO prosecution because the murders were offered as proof of the existence of a RICO enterprise that used violence to further its narcotics conspiracy. *Id.* at 682. Similarly, the record in this case is replete with evidence that members of the OMC employed violent tactics to further the objectives of the enterprise alleged by the government. The events surrounding Shannon Turner's alleged disappearance are consistent with

this theme. At trial, in addition to Solgot's testimony, the government elicited testimony from Margo Harter, a women who had a sexual relationship with David Mays in 2002. Harter testified that she knew Mays to be a member of the OMC. Harter further testified that Mays told her that he had to kill Turner because "she knew too much." Based on Harter's testimony, a reasonable inference can be drawn that the disappearance of Turner involved an act of violence intended to further and preserve the OMC enterprise.

For these reasons, the district court did not abuse its discretion in admitting at trial the evidence of Turner's disappearance.

## IV.

Finally, Garland's sentencing arguments are without merit. Garland contends that the district court committed two sentencing errors: first, by assessing two points for carrying a firearm in connection with a drug offense under U.S.S.G. § 2D1.1(b)(1), and second, by not granting a departure based on inadequacy of criminal history under U.S.S.G. § 4A1.3.

Garland first argues that the district court's application of the dangerous-weapon enhancement violated the Sixth Amendment because it was based on judicial fact-finding under the mandatory guidelines regime. There is no evidence in the record that Garland objected to the two-level enhancement on Sixth Amendment grounds. Nevertheless, the sentencing in this case took place before the Supreme Court decided *United States v. Booker*, 543 U.S. 220 (2005), and this court has held that sentences imposed based on judicial fact-finding under the mandatory guidelines

regime satisfy the plain-error test. *United States v. Davidson*, 409 F.3d 304, 309 (6th Cir. 2005).

Here, the district court applied the two-level enhancement for carrying a firearm based on judicially

found facts, and under the then-mandatory guidelines regime. However, the district court also issued

an alternative sentence in the event that the guidelines were invalidated. At the end of its sentencing

determination, the court stated the following:

> In the absence of the guidelines, I have considered all of the elements of Section
> 3553, including but not limited to the nature of the offense, the history and category
> of Mr. Garland. The sentence which I have articulated previously in this sentencing
> hearing is sufficient in my opinion to reflect the seriousness of the offense, to afford
> adequate deterrence to this defendant and others, and to protect the public from
> further crimes of the defendant.

This court has held that even where a district court "erred in sentencing [the defendant] under

the view that the Guidelines were mandatory, and erred in sentencing [the defendant] under the view

that the Guidelines were completely unconstitutional," any sentencing error is harmless under *Booker*

"when a district court imposes alternative, identical sentences, one under a regime in which

Guidelines enhancements are not mandatory." *United States v. Christopher*, 415 F.3d 590, 593 (6th

Cir. 2005) (quoting *United States v. Thompson*, 403 F.3d 533, 535 (8th Cir. 2005)). Because the

record is clear that the district court imposed an identical, alternative sentence under a regime in

which the guidelines were not mandatory, any *Booker* error in Garland's case was harmless.

Further, the district court's decision to apply the § 2D1.1(b)(1) two-level dangerous-weapon

enhancement was not clearly erroneous. *See United States v. Wheaton*, 517 F.3d 350, 367 (6th Cir.

2008) (standard of review). In applying the enhancement, the district court in Garland's case noted that

> there was significant testimony about [Garland's] . . . carrying of a gun in [relation to] drug offenses . . . . [W]hile there were only trace amounts and a large number of dollars, over $3,000, [recovered during the traffic stop of Garland], there was other testimony tying Mr. Garland to drug activity, and that was sufficient for the jury to find him guilty in Count 3. Since he was found guilty in Count 3, it is not much of a leap of faith to tie the use of guns to drug trafficking in this instance, either in the delivery of the drugs or in the offense on the motorcycle.

Consistent with the district court's conclusion, the evidence at trial established that a pistol was found on Garland after Detective Seelye initiated the traffic stop. Garland was in possession of trace amounts of drugs during that stop and a large quantity of cash. When coupled with other evidence in the record detailing Garland's drug trafficking activity, this evidence sufficiently supports the district court's application of the two-level enhancement.

Garland also claims that the district court erred by not granting a downward departure for inadequacy of criminal history under U.S.S.G. § 4A1.3. But even after *Booker*, a district court's denial of a downward departure may not be reviewed by this court unless the district court incorrectly believed that it lacked discretion to depart. *See United States v. Carter*, 510 F.3d 593, 600 (6th Cir. 2007). In Garland's case, the district court acknowledged that it had authority to depart downward based on the inadequacy of criminal history category, but the court refused to do so. Consequently, the district court's refusal to depart downward is not reviewable on appeal. To the extent that Garland's argument may be read as a challenge to the substantive reasonableness of his

sentence, *see id.*, the argument is in any event without merit. Garland's within-guidelines sentence is reasonable.

For these reasons, there is no basis for overturning Garland's sentence.

**V.**

For the foregoing reasons, Garland's convictions and sentence are affirmed.